IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ROSEANNE SANCHEZ, et al.,

        Plaintiffs,

v.                              CIVIL ACTION NO.   2:12-cv-05762

BOSTON SCIENTIFIC CORPORATION,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**(Boston Scientific's Motion for Summary Judgment Based on the Statute of Limitations)**

Pending before the court is Boston Scientific Corporation's Motion for Summary Judgment Based on the Statute of Limitations [Docket 30]. Relying on California's two-year statute of limitations, Boston Scientific argues that Ms. Sanchez's claim is time-barred. In its supporting memorandum, Boston Scientific states that Ms. Sanchez underwent four revision surgeries more than two years before she filed this action. Boston Scientific claims these surgeries put Ms. Sanchez on actual or inquiry notice of her claim more than two years before filing suit. For the reasons stated below, Boston Scientific's motion for summary judgment [Docket 30] is **DENIED**.

    **I.**    **Background**

This case is one of several thousand assigned to me by the Judicial Panel on Multidistrict Litigation and one of four (now three) bellwether cases set for trial pursuant to Pretrial Order # 54 [Docket 22]. These cases involve the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI").

On January 13, 2010, Dr. Kerri Wiltchik, M.D., implanted Ms. Sanchez with a Pinnacle Pelvic Floor Repair Kit and an Advantage Transvaginal Mid-Urethal Sling System. (*See* Boston Scientific Corp.'s Mem. in Supp. of its Mot. for Summ. J. based on the Statute of Limitations, Exhibit A [Docket 30-1], at 85-87; Exhibit B [Docket 30-2], at 3).[1] The implantation surgery took place at Marian Medical Center in Santa Maria, California. (*See* Exhibit A [Docket 30-1], at 85). The products were implanted to treat Ms. Sanchez's SUI, POP, and cystocele. (Exhibit C [Docket 30-3], at 4).

According to Ms. Sanchez's plaintiff fact sheet, she first saw a health care provider for symptoms related to the mesh in February 2010. (Exhibit C [Docket 30-3], at 6). In addition, Ms. Sanchez's deposition testimony indicated that she was experiencing a pink-tinged discharge every day since the implantation surgery. (Exhibit E [Docket 30-5], Deposition of Roseanne Sanchez, at 21:1-15). Between her implantation surgery and her first revision surgery, Ms. Sanchez complained of vaginal discharge, itching, and abdominal cramping. (Exhibit A [Docket 30-1], at 50, 52).

On April 9, 2010, approximately four months after the implantation surgery, Ms. Sanchez told Dr. Wiltchik she was experiencing "abnormal vag[inal] bleeding scant with a pink discharge which causes her to wear a daily panty liner" and also felt "something scratchy like a stitch in her vagina." (Exhibit A [Docket 30-1], at 46). Dr. Wiltchik diagnosed Ms. Sanchez as having "complications due to genitourinary device, graft, and implant." *Id.* Dr. Wiltchik excised a small portion of the mesh and applied silver nitrate to the area. (Exhibit D [Docket 30-4], Deposition of Dr. Kerri Wiltchik, at 50:1-3). Dr. Wiltchik prescribed Vagifem tablets, which would help grow the mucosa over the exposed mesh areas and promote healing. (*Id.* at 185-86:24-3). Ms. Sanchez's

---

[1] Exhibits relating to Boston Scientific's memorandum in support of its motion for summary judgment shall be identified alphabetically.

2

medical records for that day indicate she understood "that a few treatments may be required before the exposed mesh areas are completely covered and her symptoms resolve." (Exhibit A [Docket 30-1], at 46).

On May 3, 2010 Dr. Wiltchik performed a second revision surgery. (Exhibit A [Docket 30-1], at 44). Dr. Wiltchik again concluded that Ms. Sanchez was suffering from "complications due to genitourinary device, graft, and implant," specifically, exposed mesh from the Pinnacle product. (*Id.*; Exhibit D [Docket 30-4], Deposition of Dr. Kerri Wiltchik, at 49:19-22).

By her May 20, 2010, visit with Dr. Wiltchik, Ms. Sanchez testified that she was experiencing pelvic cramping and discomfort, which she believed were related to vaginal infections, as well as incontinence symptoms. (Exhibit E [Docket 30-5], Deposition of Roseanne Sanchez, at 225:11-15). Dr. Wiltchik again assessed that Ms. Sanchez's symptoms stemmed from complications with the pelvic implants. (Exhibit A [Docket 30-1], at 43). Dr. Wiltchik prescribed Metrogel-Vaginal gel, which Ms. Sanchez testified did not improve her symptoms. (*Id.* at 43; Exhibit E [Docket 30-5], Deposition of Roseanne Sanchez, at 224:14-17).

On June 14, 2010, Ms. Sanchez again complained to Dr. Wiltchik that she was experiencing copious amounts of pink-tinged discharge. (Exhibit A [Docket 30-1], at 41). According to Ms. Sanchez's medical records, "her discharge was thought to be due to her exposed mesh." (*Id.*). After a lengthy discussion with Dr. Wiltchik, Ms. Sanchez agreed to undergo another revision surgery, this time under general anesthesia. (*Id.* at 42). Ms. Sanchez understood that the procedure would help stop the mesh from poking through her vaginal wall. (Exhibit E [Docket 30-5], Deposition of Roseanne Sanchez, at 230:3-6). On June 18, 2010, Dr. Wiltchik removed a large portion of exposed mesh. (Exhibit A [Docket 30-1], at 80). This was Ms. Sanchez's third revision surgery.

Despite these three revisions of the mesh and other treatments, Ms. Sanchez's symptoms did not improve. (*See id.* at 39, 35). On September 1, 2010, Ms. Sanchez reported to Dr. Wiltchik that she was experiencing abnormal vaginal bleeding, pink-tinged discharge, and discomfort with intercourse. (*Id.* at 35). The medical record for this date indicates Ms. Sanchez understood that "her symptoms are due to a small amount of exposed mesh." (*Id.*). For the fourth time, Dr. Wiltchik completed an in-office excision of the exposed mesh. (*Id.*). Later, on September 17, 2010, Ms. Sanchez agreed to undergo another revision surgery under anesthesia because her symptoms had not resolved. (*Id.* at 33).

According to the plaintiffs, during these medical visits, Dr. Wiltchik never told Ms. Sanchez that her symptoms were related to a defect in the mesh. (*See* Pls.' Resp. in Opp'n to Boston Scientific Corp.'s Mot. for Summ. J. based on the Statute of Limitations [Docket 32], at 4). Ms. Sanchez testified that during one of her medical appointments, Dr. Wiltchik said, "[f]or one reason or another . . . the skin was not healing over the mesh." (Exhibit E [Docket 30-5], Deposition of Roseanne Sanchez, at 221:11-13). According to Dr. Wiltchik's progress notes on May 11, 2011, she "discussed at length patient's reaction to mesh and propensity for body to expel mesh." (*See* Pls.' Resp. in Opp'n to Boston Scientific Corp.'s Mot. for Summ. J. based on the Statute of Limitations, Exhibit 3 [Docket 32-3], Deposition of Dr. Kerri Wiltchik, at 191:9-14).[2] Dr. Wiltchik told Ms. Sanchez she had "no idea why this was happening and for some reason [Ms. Sanchez's] body did not like" the mesh products. (*Id.* at 191:19-21). In addition, Dr. Wiltchik testified that she has never attributed the cause of Ms. Sanchez's symptoms to a defect in the mesh. (*See id.* at 223:17-21; 224:14-16, 23-25; 225:1-11).

---

[2] Exhibits relating to the plaintiffs' response to Boston Scientific's motion for summary judgment will be referred to numerically.

4

Ms. Sanchez's plaintiff fact sheet indicates she became aware that her injuries were related to a defect in the mesh implants in August 2011. (Exhibit C [Docket 30-3], at 6). According to the plaintiffs, Ms. Sanchez saw an advertisement for transvaginal mesh litigation on television, which caused her to seek representation. (*See* Exhibit 7 [Docket 32-7], at 28:5-16). However, Ms. Sanchez's deposition testimony reveals that she did not know the month or the year she saw the advertisement. (Exhibit A [Docket 34-1], at 36:10-16). On September 21, 2012, Ms. Sanchez directly filed suit in MDL 2326 pursuant to Pretrial Order # 12 [Docket 176].[3]

## II. Choice of Law

In multidistrict litigation cases, the choice-of-law determination for pre-trial motions hinges upon whether federal or state law governs. "When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (internal citations omitted); *see Toll Bros., Inc. v. Dryvit Sys., Inc.*, 432 F.3d 564, 568 n. 4 (4th Cir. 2005) (applying Connecticut state law in transferred multidistrict litigation case based on diversity jurisdiction and citing to *In re Temporomandibular (TMJ) Joint Implants Prods. Liab. Litig.*, 97 F.3d at 1055); *Bradley v. United States*, 161 F.3d 777, 782 n. 4 (4th Cir. 1998); *see also* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3866 (3d ed. 2009).

This case is based on diversity jurisdiction. Federal law thus controls procedural issues and state law controls substantive issues. *Dixon v. Edwards*, 290 F.3d 690, 710 (4th Cir. 2002). The standard for summary judgment is procedural; therefore, the federal standard applies. *Gen.*

---

[3] Pretrial Order # 12 was amended by Pretrial Order # 14 [Docket 196] on September 26, 2012. Pretrial Order # 14 did not modify sections regarding direct filing into the MDL.

*Accident Fire & Life Assurance Co. v. Akzona, Inc.*, 622 F.2d 90, 93 n. 5 (4th Cir. 1980). In determining which state substantive law governs this dispute, I must first identify which choice-of-law rules to follow.

A majority of cases in an MDL are transferred from other forums pursuant to 28 U.S.C. § 1407. *See* William B. Rubenstein, *Newberg on Class Actions* § 10:29 (5th ed. 2013). With respect to these transferred cases, courts routinely apply the choice-of-law of the originating forum. *See, e.g.*, *In re Temporomandibular (TMJ) Joint Implants Prods. Liab. Litig.*, 97 F.3d at 1055; *see also Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010) ("When a diversity case is transferred by the multidistrict litigation panel, the law applied is that of the jurisdiction from which the case was transferred . . . .").

However, plaintiffs may bypass the transfer process by directly filing into the MDL. *See* Andrew D. Bradt, *The Shortest Distance: Direct Filing and Choice of Law in Multidistrict Litigation*, 88 Notre Dame L. Rev. 759, 794 (2012). Some cases are directly filed into the MDL and originate in the MDL court's judicial district. Others cases originate elsewhere and are directly filed into the MDL. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2011 WL 1375011, at *4 (S.D. Ill. Apr. 12, 2011).

The difficulty with the latter category of cases is there technically is no prior proper forum whose choice-of-law rules should apply. In addition, many direct filing orders indicate direct filing does not make the MDL court a "transferor court," and thus has no effect on choice-of-law. Bradt, *supra*, at 764; *see, e.g.*, Pretrial Order # 14 [Docket 196], at 3 ("This court shall not be deemed to be the 'transferor court' simply by virtue of the action having been directly filed into MDL No. 2326."). Without a prior proper forum and a disclaimer that direct filing does not affect choice-of-law, it may be difficult to determine which forum's choice-of-law should apply.

For cases that originate outside the MDL court's judicial district and are filed directly into the MDL, many courts apply the choice-of-law rules of the "originating jurisdiction." *In re Watson Fentanyl Patch Prods. Liab. Litig.*, MDL No. 2732, 2013 WL 4564927, at *2 (N.D. Ill. Aug. 27, 2013) ("Indeed, the prevailing rule in this situation is that in a case that was directly filed in the MDL transferee court but that originated elsewhere, the law (including the choice of law rules) that applies is the law of the state where the case originated."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 1375011, at *6 ("[T]he Court concludes that the better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated."). *See generally Wahl v. Gen. Elec. Co.*, No. 3:13-CV-0329, 2013 WL 604818, at *4 (M.D. Tenn. Nov. 14, 2013) ("Most of the courts that have considered this peculiar procedural posture have stated that it is appropriate to apply the choice of law rules of the 'originating' jurisdiction (i.e., where the case would have [been] brought but for the CMO permitting direct filing), rather than the choice of law rules of the MDL Court.").

In prescription drug MDLs, the originating jurisdiction is the place where the drug was purchased and prescribed. *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 1375011, at *6 ("[T]he better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated," which is "the state where the plaintiff purchased and was prescribed the subject drug."); *In re Avandia Mktg, Sales Practices & Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 3205620, at *2 (E.D. Pa. Aug. 7, 2010) ("The Court has concluded, as have other MDL courts, that such cases should be governed by the law of the states where Plaintiffs received treatment and prescriptions for Avandia. This ruling will promote uniform treatment between those Plaintiffs whose cases

were transferred into the MDL from their home states and those Plaintiffs who filed directly in the MDL.").

For cases that originate elsewhere and are directly filed into the MDL, I will follow the better-reasoned authority that applies the choice-of-law rules of the originating jurisdiction, which in our case is the state in which the plaintiff was implanted with the product. Here, the plaintiff was implanted with the product in Santa Maria, California. Therefore, California choice-of-law rules will govern the selection of the statute of limitations.

California uses the governmental interest approach to analyze choice-of-law questions. *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1080-81 (Cal. 2001). Under this approach, the parties agree that the California statute of limitations would apply. Because the parties agree on this point, I will assume that it is not an issue. Therefore, I will apply the California statute of limitations to determine whether Ms. Sanchez's claim is time-barred.

### III. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at

256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

## IV. Discussion

In California, there is a two-year statute of limitations for personal injury actions. Cal. Civ. Proc. Code § 335.1. This statute applies to injuries involving defective products regardless of the legal theory asserted. *See, e.g.*, *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002). The general rule is that a cause of action accrues when all of its elements are complete. *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005). However, the discovery rule tolls accrual until the plaintiff "is aware of her injury and its negligent cause." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109 (1988). In other words, the statute begins to run "when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Id.* at 1110. "Wrong" is not used "in any technical sense, but rather in accordance with a lay understanding." *Id.* "The question when a plaintiff actually discovered or reasonably should have discovered the facts for purposes of the delayed discovery rule is a question of fact unless the evidence can support only one reasonable conclusion." *Ovando v. County of Los Angeles*, 159 Cal. App. 4th 42, 61 (2008).

In a case involving both medical malpractice and products liability claims, the California Supreme Court has stated that "a plaintiff's ignorance of wrongdoing involving a product's defect will usually delay accrual because such wrongdoing is essential to that cause of action." *Fox*, 110 P.3d at 924. Simply put, "[t]he discovery rule does not trigger accrual of a cause of action unless the plaintiff has some reason to suspect wrongdoing; that is, when a plaintiff, through reasonably diligent investigation, discovers only that he has been injured but not that the injury may have a wrongful cause, then the clock has not yet begun to run." *Hendrix v. Novartis Pharm. Corp.*, No. CV-13-2402-MWF PLAX, 2013 WL 5491846, at *5 (C.D. Cal. Oct. 2, 2013).

However, in order to use the discovery rule to delay accrual, the plaintiff must "plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 110 P.3d at 921. In other words, "to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." *Id.*

Boston Scientific argues that Ms. Sanchez had discovered the wrongful cause of her injuries more than two years before she filed suit. First, Ms. Sanchez had at least four revision surgeries, which should have put her on actual or inquiry notice that her symptoms were related to a problem with the mesh implants. In support of this contention, Boston Scientific cites *Coleman v. Boston Scientific*, No. 1:10-CV-01968-0WW, 2011 WL 3813173 (E.D. Cal. Aug. 29, 2011). In *Coleman*, the plaintiff was implanted with a Boston Scientific mesh product on December 5, 2006. *Id.* at *1. "From July 2007 to March 2009, the plaintiff had surgery, vaginal reconstruction, and

10

mesh removal in order to treat her 'recurrent symptoms of pelvic pain, erosion and recurrent infection of the tissue surrounding the mesh.'" *Id.* The plaintiff filed suit more than two years after her July 2007 surgery. *See id.* The plaintiff argued she was not on notice until she had seen a 2008 FDA Notice regarding the possible defectiveness of the product. *Id.* at *3. The United States District Court for the Eastern Division of California stated that

> A reasonable person who is implanted with a medical device, which requires a second corrective surgery to remove the device and correct injuries resulting there from within a year of implantation [,] should suspect the defectiveness of the device and conduct a reasonable inquiry and examination into the suitability of the device.

*Id.* Second, Boston Scientific claims that if Ms. Sanchez had consulted Dr. Wiltchik, her medical records, or the publicly available 2008 FDA Notice, she would have discovered that her injuries were related to a problem with the mesh.

The plaintiff counters that *Coleman* does not apply to this case because the court never found as a matter of law that the plaintiff had discovered the wrongful cause of her injury. In a footnote, the court noted that "[d]ue to the lack of detail concerning the nature of Plaintiff's 2007 surgery, it cannot be said as a matter of law that Plaintiff was on inquiry notice of her claims in 2007." *Id.* at *3 n. 1. Instead, the plaintiffs claim Ms. Sanchez had notice of the wrongful cause of her symptoms, i.e. product defect, when she observed a television advertisement about mesh litigation in August 2011. The plaintiffs argue that Ms. Sanchez did not initially suspect a defect caused her injuries because Dr. Wiltchik stated that her symptoms were related to her body's rejection of the mesh, not the mesh itself. In addition, the plaintiffs contend that Ms. Sanchez's nineteen visits with her physician, or an investigation of her medical records, would not have revealed this wrongful cause because Dr. Wiltchik did not suspect that Ms. Sanchez's injuries were caused by a defect in the mesh.

In other words, the plaintiffs claim that summary judgment is not appropriate because the record supports two inferences: First, Ms. Sanchez initially suspected that her symptoms was related to her body's rejection of the mesh and only in August 2011 did she discover her symptoms had a wrongful cause. Conversely, she knew after four surgeries, including a surgery under anesthesia, that something was wrong with the product, not her body, and thus was on inquiry notice.

For instruction on this point, the plaintiffs cite *Clark v. Baxter Healthcare Corp.*, 83 Cal. App. 4th 1048 (2000). In *Clark*, the plaintiff began experiencing allergic reactions to latex gloves starting in 1992. *Id.* at 1053. The plaintiff consulted with an allergist who suggested that the plaintiff was allergic to the gloves. *Id.* In May 1995, the plaintiff had a serious allergic response to the latex gloves. *Id.* at 1053. By the end of 1995, the plaintiff joined a support group. *Id.* The group gave her a flyer regarding latex allergies litigation, which indicated that there might be a defect in the latex gloves. *Id.* The plaintiff filed suit against the glove manufacturers on January 23, 1996. *Id.* The flyer was entered into the record, and the plaintiff submitted a declaration stating when she had received the flyer. *Id.* The defendants moved for summary judgment based on the statute of limitations. *Id.*

The California Court of Appeals found that there was a triable issue of fact because the record supported two reasonable inferences—(1) the plaintiff "could reasonably have inferred from the advice given her by various doctors and from the severity of the May 1995 acute reaction, caused by gloves she was not wearing, that more than a natural allergy to a natural substance was involved, and that a product defect or a contaminated product could have been a causative factor" or (2) "that she did not become aware of a potential wrongfulness component of her cause of action until more information than the existence of her allergies placed her on inquiry notice and then was

12

actually gained." *Id.* at 1059-60. If the plaintiff identified the negligent cause of her injuries by May 1995, her action would be time-barred. However, if she was unaware of this negligent cause until the end of 1995, her claim was timely filed. Accordingly, the court denied the defendants' motion for summary judgment.

If I were permitted to weigh evidence at the summary judgment stage, it is unlikely that Ms. Sanchez would prevail. However, I am not a fact finder. Therefore, based on the record before me, I must reluctantly conclude that there is a genuine issue of material fact regarding when Ms. Sanchez suspected that wrongdoing caused her injuries.

On one hand, a jury might believe that Ms. Sanchez initially suspected the cause of her symptoms was related to her body's rejection of the mesh. Dr. Wiltchik never told Ms. Sanchez that her symptoms were caused by a defect in the mesh. In addition, Dr. Wiltchik never suspected that a defect could be causing Ms. Sanchez's symptoms. One could reasonably conclude that Ms. Sanchez's body simply "didn't like" the mesh. Ms. Sanchez may have continued to believe this to be the cause of her symptoms until August 2011, when she allegedly viewed the television advertisement. The jury might reach this conclusion even though Ms. Sanchez's deposition testimony reveals she could not remember the exact date when she saw the advertisement. Thus, a jury could reasonably infer that Ms. Sanchez discovered the wrongful cause of injuries in August 2011 and thus timely filed her action.

On the other hand, a jury might conclude that after four revision surgeries, several medical treatments, and nineteen medical appointments, her body's rejection of the mesh was not a reasonable explanation of her symptoms. A reasonable person could conclude that the cause of Ms. Sanchez's injuries was a defect in the product, not her body's natural reaction to the mesh.

Thus, a jury could infer that Ms. Sanchez discovered the wrongful cause of her injuries more than two years before filing suit. Therefore, her claim could be time-barred.

Assuming that Ms. Sanchez did suspect or should have suspected wrongdoing more than two years before filing, and thus had a duty to investigate, whether that investigation was reasonable is a more difficult issue. *See Fox*, 110 P.3d at 921 ("[A] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury."); *Jolly*, 44 Cal. 3d at 1111 ("Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her."); *Nelson v. Indevus Pharm., Inc.,* 142 Cal. App. 4th 1202, 1206 (2006) ("When the cases are read in whole, rather than in isolated quotes, it is clear that a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate. A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements. We look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (internal citations, quotations, and alterations omitted)).

Because Dr. Wiltchik testified that she never told Ms. Sanchez her symptoms were due to a defect in the mesh, a jury could reasonably conclude that consultations with Dr. Wiltchik or a review of the medical records would not have given Ms. Sanchez a reason for suspicion of wrongdoing. (Exhibit 3 [Docket 32-3], Deposition of Dr. Kerri Wiltchik, at 223:17-21; 224:14-16; 224-225:23-11). While the evidence presented at trial may ultimately lead to a finding by the jury that Ms. Sanchez had a duty to investigate based on her multiple surgeries, there is enough of a material dispute to render summary judgment inappropriate.

For these reasons, I cannot determine as a matter of law that Ms. Sanchez discovered her cause of action more than two years before filing suit. Accordingly, I **DENY** Boston Scientific's motion for summary judgment. *See Ward v. Westinghouse Canada, Inc.*, 32 F.3d 1405, 1408 (9th Cir. 1994) (applying California law) (factual issue regarding when plaintiff suspected wrongdoing not suitable for summary judgment). *See generally Sylve v. Riley*, 15 Cal. App. 4th 23, 26 (1993) ("Whether reasonable diligence was exercised is generally a question of fact precluding summary judgment.").

## V.     Conclusion

For the reasons discussed above, Boston Scientific's Motion for Summary Judgment [Docket 30] is **DENIED** . The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:     January 17, 2014

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE